UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------X
LINDA O'NEAL,

       Plaintiff,                 <u>OPINION AND ORDER</u>

   -against-                 Civil Action No.
                              CV-01-7802 (DGT)

STATE UNIVERSITY OF NEW YORK,
HEALTH SCIENCE CENTER
BROOKLYN; MICHAEL BRENNAN,
COMMISSIONER OF EDUCATION;
STATE UNIVERSITY OF NEW YORK,

       Defendants.
-------------------------X

TRAGER, J.

     Plaintiff Linda O'Neal brings this action against defendants
the State University of New York, Health Science Center Brooklyn
("SUNY HSCB"), the State University of New York ("SUNY"), and
Michael Brennan, Commissioner of Education[1] (collectively
"defendants"), pursuant to Title VII of the Civil Rights Act of
1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").
Plaintiff alleges that she was subjected to a hostile work
environment and gender discrimination.  Plaintiff also alleges
that defendants retaliated against her for filing a gender
discrimination complaint with the New York State Division of
Human Rights ("NYSDHR").  Additionally, plaintiff asserts an
ambiguous state law tort claim against both SUNY HSCB and Brennan

---

[1] Brennan in fact holds the title of Deputy Director of
Labor Relations.  Brennan Decl. ¶ 1.

seeking "pain and suffering." Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## Background

Defendants previously moved to dismiss plaintiff's initial complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief could be granted. In a March 24, 2003 Memorandum and Order, plaintiff's race discrimination claim was dismissed for failure to exhaust administrative remedies and her state law pain and suffering claim was dismissed as barred by the Eleventh Amendment. O'Neal v. State Univ. of N.Y., No. 01-CV-7802, 2003 WL 1524664 (E.D.N.Y. Mar. 24, 2003). Plaintiff's gender discrimination claim was also dismissed for failure to state a claim, but she was granted leave to amend the complaint if she wished to pursue a gender discrimination claim premised on constructive discharge. Plaintiff filed an amended complaint alleging such a claim on May 2, 2003. Curiously, in the amended complaint, plaintiff drops all mention of gender as the basis of the discrimination she allegedly suffered. Defendants have nevertheless proceeded on the theory that O'Neal is alleging gender-based discrimination.

O'Neal worked as a drug-abuse intervention counselor for SUNY HSCB between 1971 and 2000.  Pl.'s Decl. ¶¶ 1-7.  From 1971 until 1973, O'Neal worked at SUNY's Loft Satellite clinic in a program devoted to adolescent outreach.  Pl.'s Dep., Ex. B. at 26-29.  During this period, O'Neal worked alongside a counselor named Charles Myzwinski, apparently without incident.  Pl.'s Dep., Ex. B at 49, 55.  In 1973, O'Neal transferred to SUNY's Polydrug Clinic, where she worked with adult drug addicts.  Pl.'s Dep., Ex. B at 54-56.

In 1995, Myzwinski also joined the Polydrug Clinic, assuming the position of Assistant Director of Counseling, which he held almost continuously until he retired in 2002.[2]  Halloran Decl., ¶ 4.  Myzwinski did not directly supervise O'Neal, but he shared overall responsibility for managing the Polydrug Clinic with Unit Supervisor Gerard Halloran.  Myzwinski Dep. Ex. 1 at 14-17; Halloran Decl. ¶ 7.  While Halloran managed the clinic's day-to-day operations, Halloran Decl. ¶ 6, Myzwinski oversaw the clinic's counseling services.  Myzwinski Decl. ¶ 6.

According to O'Neal, Myzwinski continually harassed her between 1998 and 2000.  Pl.'s Dep., Ex. B at 93, 118, 122, 127, 129.  O'Neal points to a number of specific incidents involving

---

[2] Myzinski worked as the Director of Cornell University's Midtown Center clinic from August 1996 until early 1997. Myzwinski Decl. ¶ 1.

alleged harassment. In October 1998, Myzwinski aggressively reproached her for keeping a patient waiting, just as she was retrieving the patient from the clinic's waiting area. Id. at 92-95. That same month, O'Neal briefly stopped in the hallway to tell the clinic secretary that she was expecting an important call from her father's nursing home when Myzwinski loudly yelled at O'Neal to "get out of the hallway." Pl.'s Decl. ¶ 51. During a later meeting with Halloran and Myzwinski, Myzwinski confronted O'Neal in an intimidating manner regarding her presence in the hallway. Id. ¶ 66. Additionally, O'Neal alleges that on at least one occasion in April or May 1999, Myzwinski falsely reported to Halloran that she had failed to conduct a group counseling session that she had, in fact, conducted. Id. ¶¶ 73-74.

O'Neal also cites to an incident that occurred during a meeting in October 1999. While making an oral presentation to the staff, Myzwinski heard a noise that he believed came from O'Neal's direction. Myzwinski Decl. ¶¶ 8-9. Myzwinski stopped his presentation and confronted O'Neal. Id. ¶¶ 9-10. After the meeting, however, another counselor, Serap Turker, admitted to Myzwinski that she had made the noise. Id. ¶ 11. At the next staff meeting, Myzwinski made a general apology to the staff for falsely accusing O'Neal. Id. ¶ 12.

O'Neal found the apology insufficient, and on November 15,

1999 she filed an Internal Discrimination Grievance Procedure Complaint based on race, color and sexual harassment. Conde-Billy Decl. ¶ 15. The grievance cited both the staff-meeting incident and the 1998 hallway confrontations. Id. ¶ 16; see Ex. G. In response, on December 13, 1999, Myzwinski apologized directly to O'Neal in writing for embarrassing her at the staff meeting, but failed to mention the hallway incidents. Conde-Billy Decl. ¶ 28; Ex. H. The next day O'Neal signed a one-sentence Settlement of Grievance which stated, "[t]he attached letter from Mr. Charles Myzwinski is an acceptable resolution of my complaint filed on November 15, 1999 concerning alleged discrimination." Conde-Billy Decl. ¶ 31; Ex. H.

In addition to the specific instances cited above, O'Neal alleges some forms of ongoing harassment. According to O'Neal, Myzwinski continually bypassed her immediate supervisor, Halloran, to criticize her work and make negative comments about her in front of her colleagues and patients. Pl.'s Dep., Ex. B. at 92, 96, 118, 127, 129, 176; Pl.'s Decl. ¶ 66. O'Neal also alleges that beginning in 1998, Myzwinski began to close the door to her office every time he walked by, without O'Neal's permission and without giving an explanation. Pl.'s Decl. ¶¶ 42, 44-47. O'Neal also alleges that she complained to Halloran, but that Myzwinski continued to shut the door up to three times per day. Id. ¶¶ 47-48, 76.

On June 8, 2000, the door-closing incidents culminated in an altercation between O'Neal and Myzwinki.[3] According to O'Neal, when Myzwinski started to close her door, she told him not to touch the door and then struggled with him to keep the door open. Pl's Dep., Ex. B at 188-216; Pl's Decl. ¶¶ 77-78. When Myzwinski finally let go of the door, the door swung toward O'Neal and struck her on the knee. Pl's Decl. ¶ 79. Myzwinski attested to a conflicting version of the encounter, implying that the door never hit O'Neal on the knee. Myzwinski Dep., Ex. 1 at 35-38; Ex. L (incident report drafted by Myzwinski dated June 27, 2000). At her deposition in October 2004, O'Neal stated that the struggle lasted "a good three, maybe four, five minutes." Pl's Dep., Ex. B at 211. On prior occasions, O'Neal had stated, in writing, that Myzwinski let the door go "a few seconds" after she requested that he remove his hand from her door. Ex. J; Ex. R.

According to plaintiff, in the hours following the confrontation with Myzwinski, her knee swelled to the point where she could no longer stand. Pl.'s Decl. ¶ 79. After this incident, plaintiff did not return to work at the Polydrug Clinic, allegedly because of a permanent physical disability to her knee and her feelings of intimidation. Pl.'s Dep., Ex. B. at

---

[3] O'Neal asserts that this incident occurred on June 10 whereas defendants assert that it occurred on June 8. Purely for purposes of simplicity, the incident will be referred to as occurring on June 8. It should be noted, however, that June 10 was a Saturday.

252-53; Pl.'s Decl. ¶¶ 77-99, 100.

During June 2000, O'Neal saw three different doctors concerning her knee. Dr. Ronald Richmond filled out a disability certificate on June 15, 2000. Ex. 3. Although the form states that O'Neal was under Dr. Richman's care for her right knee, no information was entered in the section identifying how long O'Neal would be incapacitated. Id. O'Neal also saw Dr. Shaheed Khan. Ex. AA at 12. In a letter dated June 12, 2000, Dr. Khan stated that it was "undecide[d] when O'Neal would be cleared for work." Ex. 2. In a letter dated June 14, 2000, Dr. Khan stated that O'Neal was "cleared to return to work" on June 21, 2000. Ex. I. In a letter dated June 21, 2000, Dr. Kahn stated that O'Neal was cleared to return to work on July 12, 2000. Ex. K. According to O'Neal, Khan eventually referred her to Dr. Leon Bernstein. Pl's Dep., Ex. C at 285. In a letter dated June 30, 2000, Dr. Bernstein concluded that O'Neal "has been totally disabled from work since the date of injury." Ex. 6. Dr. Bernstein issued similar letters through December 2000. Id.

On or about July 3, 2000, plaintiff initiated a claim for workers' compensation benefits based on the injury to her knee. Pl.'s Dep., Ex. C at 262-268; Ex. Q. On August 15, 2000, O'Neal filed a complaint with NYSDHR alleging gender discrimination during her employment at the clinic. Pl's Decl. ¶ 102; Ex. R. O'Neal predicated this complaint on Myzwinski's allegedly

7

derogatory attitude towards women, the October 14, 1999 staff-meeting incident and the June 8, 2000 door-closing incident. Ex. R. On or around August 28, 2000, Brennan received a copy of the complaint from Halloran. Brennan Decl. ¶ 7. Although no specific date is provided, Halloran appears to have received the complaint a few days earlier. Halloran Decl. ¶¶ 18-19. Myzwinski learned of the complaint in early September 2000. Myzwinski Decl. ¶ 31.

On or around August 25, 2000, O'Neal was granted a leave of absence without pay from July 3, 2000 through September 27, 2000. Ex. S. On August 30, 2000, Dr. Milton Smith conducted an independent examination of O'Neal in conjunction with her workers' compensation claim and issued a report stating that O'Neal was capable of all work activities as a counselor. Beginning in early September, Brennan, the Deputy Director of Labor Relations, conducted an investigation into plaintiff's NYSDHR complaint. Brennan Decl. at 7. Brennan interviewed a number of individuals including Halloran and Myzwinski. Id. at 7. Halloran informed Brennan that prior to the June 8th door-closing incident, O'Neal had stated that she had past problems with her knees and would need to take a leave of absence to attend to those problems. Id. at 7-8. According to Brennan, Myzwinski told him that O'Neal's knee was not struck by the door on June 8. Id. at 8.

Personnel Associate Stephanie Watson sent plaintiff a letter, dated September 13, 2000, which, based on Dr. Smith's evaluation, instructed O'Neal to return to work on September 18, 2000 and stated that "should you not return to duty, your absence will be considered unauthorized and may subject you to disciplinary action."  Exhibit U.  O'Neal did not report to work on September 18, 2000.  On October 6, 2000, Brennan sent plaintiff a follow-up letter referencing the earlier communication and informing O'Neal that because she "failed to report to work as directed," she was being "placed on unauthorized leave without pay" and that her "continued absence will subject [her] to disciplinary action."  Ex. X.  Four days later, Brennan sent O'Neal a letter directing her to appear at his office for a disciplinary interview.  Brennan Decl. ¶ 54; Ex. Y.  O'Neal attended the disciplinary interview on October 20, 2000, but no disciplinary action was ever taken against her.  Brennan Decl. ¶¶ 55, 64-65; Ex. AA.

On November 6, 2000, Brennan wrote a letter to the New York State Insurance Fund ("Fund"), urging the Fund to oppose O'Neal's claim for workers' compensation.  Ex. DD.  Brennan stated that SUNY HSCB believed that "O'Neal's claim that she was injured by her office door during a dispute with a supervisor is a fabrication."  Id.  Brennan based that conclusion on, among other evidence, Dr. Smith's medical report, Dr. Khan's June 21, 2000

assessment, and the statements of Myzwinski and Halloran. In the letter, Brennan stated that he had not previously written to the Fund due to "an administrative oversight." Id.

According to O'Neal, in either November or December 2000 Brennan called Dr. Bernstein to find out O'Neal's medical status. Pl.'s Dep., Ex. C at 351-54. According to O'Neal, Brennan told Bernstein that he thought O'Neal was lying. Id. at 350. In mid-December 2000, as part of his ongoing disciplinary investigation, Brennan asked Dr. Thomas Haher to conduct an independent medical examination. Brennan Decl. ¶¶ 66-97. Prior to the scheduled examination, Brennan sent Dr. Haher a letter explaining the circumstances of O'Neal's case and stating that "we are concerned that Ms. O'Neal may be feigning the existence or seriousness of her current ailment to avoid working. We are also concerned that she may be fabricating the cause of any disability to qualify for Worker's Compensation payments to which she is not legitimately entitled." Ex. GG. Haher examined O'Neal on December 22, 2000. Ex. KK. Despite numerous requests, by May 14, 2001, Haher had still not produced a written report. Ex. 22. As a result, Brennan faxed a pre-written statement to Haher to sign, which Brennan claims simply summarized a telephone conversation the two held after Haher examined O'Neal. Brennan Decl. ¶¶ 80, 91-92. In the statement, Brennan wrote:

> My examination of Ms. O'Neal did not reveal
> anything physically wrong with her knee. She told

10

> me that she expects to have surgery on her knee for
> a torn menial meniscus. The manner in which she
> states she was injured, however, is not consistent
> with a diagnosis of a torn meniscus. I recommend
> that Ms. O'Neal's MRI be read by a radiologist to
> determine whether in fact she suffers from a torn
> meniscus. In my medical opinion, unless the MRI's
> indicate otherwise, Ms. O'Neal was fit for duty on
> the day I examined her.

Ex. 22. Brennan also wrote that "[i]f this summary does not

comport with your recollection of your findings, please advise me

at your earliest opportunity." Id. Although Haher never signed

that statement, later that day he faxed Brennan a report, dated

January 3, 2001, concerning his examination of plaintiff.

Haher's report stated that

> [i]t is difficult to say whether or not patient is
> fit for duty based on her physical exam. The
> physical exam has no objective findings. However,
> if the MRI were to show gross pathology of the knee
> then the patient would not be fit for duty. I am
> therefore waiting a formal reading of the MRI from
> a radiologist.

Ex. KK. Haher diagnosed O'Neal with "[o]steoarthritis of the

medial compartment of the right knee, chronic in nature." Id.

O'Neal continued on unauthorized leave until December 31,

2002, at which point her position was eliminated in a

restructuring. Ex. QQ.


## Discussion

**a. Summary Judgment Standard**

To prevail on their motion for summary judgment, defendants

11

must prove that no genuine issues of material fact exist and they are, therefore, entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Issues are considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In a motion for summary judgment, all factual inferences should be drawn in favor of the non-moving party. Id. at 255; Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

**b.  Settlement of Grievance**

As an initial matter, defendants argue that the Settlement of Grievance O'Neal signed on December 14, 1999 fully resolved O'Neal's complaints with respect to the 1998 hallway incidents and the 1999 staff-meeting. An employee may "waive his cause of action under Title VII as part of a voluntary settlement" so long as the employee's consent to the settlement is "voluntary and knowing." Alexander v. Gardner-Denver Co., 415 U.S. 36, 52, 52 n.15 (1974); Reidy v. Runyon, 971 F. Supp. 760, 764 (E.D.N.Y. 1997); Cordoba v. Beau Dietl & Assocs., No. 02-CV-4951, 2003 WL 22902266, at *4 (S.D.N.Y. Dec. 8, 2003). In assessing whether plaintiff knowingly and voluntarily waived her right to file suit, the totality of the circumstances must be considered. Bormann v. AT&T Commc'ns, Inc., 875 F.2d 399, 403 (2d Cir. 1989). In making that determination, a court should consider: (1) the

12

plaintiff's education and business experience; (2) the amount of
time the plaintiff had possession of or access to the agreement
before signing it; (3) the role of plaintiff in deciding the
terms of the agreement; (4) the clarity of the agreement; (5)
whether the plaintiff was represented by or consulted with an
attorney; (6) whether the consideration given in exchange for the
waiver exceeds employee benefits to which the employee was
already entitled by contract or law; (7) whether an employer
encourages or discourages an employee to consult an attorney; and
(8) whether the employee had a fair opportunity to consult an
attorney.  Id.

Based on those factors, the Settlement of Grievance cannot,
as a matter of law, preclude O'Neal from bringing a suit based on
the same facts raised in her internal discrimination complaint.
Critically, the Settlement of Grievance consists of a single
sentence stating Myzwinski's written apology is "an acceptable
resolution of my complaint filed on November 15, 1999, concerning
alleged discrimination."  That language is not a clear waiver of
O'Neal's rights to pursue her claims in court.  Furthermore, the
record provides no indication that O'Neal was represented by, or
was offered the opportunity to consult with, an attorney.  Cf.
Laramee v. Jewish Guild for Blind, 72 F. Supp. 2d 357 (S.D.N.Y.
1999) (dismissing Title VII action where the settlement agreement
stated that the plaintiff was waiving her right to bring any

action against her employer pertaining to the conditions or termination of her employment and the plaintiff was represented by an attorney).

**c.    Hostile Work Environment Claim**

Under Title VII, a hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation omitted).  The workplace must be viewed as hostile both from the perspective of an objective reasonable person and from the victim's subjective viewpoint. Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).  The conduct that creates such an environment must also be motivated by the plaintiff's gender.  See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . through subjection to a hostile work environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").  The viability of O'Neal's hostile work environment claim ultimately turns on: (1) whether O'Neal was subjected to an objectively hostile work environment, and (2) whether there is sufficient evidence to establish that O'Neal was subjected to such an environment because of her gender.

### (i)  Objectively Hostile Work Environment

"As a general rule, incidents must be more than episodic;
they must be sufficiently continuous and concerted in order to be
deemed pervasive.  Isolated acts, unless very serious, do not
meet the threshold of severity or pervasiveness."[4]  <u>Alfano</u>, 294
F.3d at 374; <u>see</u> <u>Richardson v. N.Y. State Dep't of Corr. Servs.</u>,
180 F.3d 426, 437 (2d Cir. 1999) ("isolated, minor episodes of
harassment do not merit relief under Title VII." (quoting <u>Torres
v. Pisano</u>, 116 F.3d 625, 631 (2d Cir. 1997))).  In evaluating a
hostile work environment claim, courts should consider "the
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance".  <u>Harris</u>, 510 U.S. at 23.

O'Neal points to specific incidents in which Myzwinski:  (1)
undermined her in the hallway in front of clients;
(2) embarrassed her at a staff meeting in front of colleagues;
(3) bypassed her direct supervisor; and (4) closed her door
without permission or explanation.  The specific incidents
relayed by O'Neil are not sufficiently "continuous and concerted"

---

[4] For the purpose of determining whether an objectively
hostile work environment existed, it will be assumed that the
gender-neutral incidents alleged by plaintiff were motivated by
her gender.  An analysis of whether O'Neal has adduced sufficient
evidence to show that the gender-neutral harassment she suffered
was in fact motivated by her gender is undertaken in subsection
2c(ii).

to establish an objectively hostile work environment.  <u>Alfano</u>,
294 F.3d at 374.

O'Neal also argues that the June 8, 2000 door-closing
incident, which allegedly involved a struggle over the door
handle that resulted in the door striking O'Neal's knee, was such
a serious assault that it, standing alone, establishes a hostile
work environment.  Because a single sexual assault "clearly
creates" a hostile work environment, <u>Tomka v. Seiler Corp.</u>, 66
F.3d 1295, 1305 (2d Cir. 1995), <u>abrogated on other grounds by</u>
<u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998), a non-
sexual physical assault would also be sufficient if it was
motivated by plaintiff's gender.  There is, however, no evidence
suggesting that Myzwinski attempted to injure O'Neal by releasing
the door handle.  Although the June 8th incident is more
objectionable than the other door-closing incidents that O'Neal
endured, even when viewed in the light most favorable to O'Neal,
it is not, standing alone, "severe" enough to establish a hostile
work environment.

Although the individual incidents cited by O'Neal are
insufficient, in her deposition she stated that some of the
harassment was continuous.  "General allegations of constant
abuse" can be sufficient to establish that the harassment in
question was pervasive." <u>Torres</u>, 116 F.3d at 631.  O'Neal stated
that Myzwinski "constantly" would question her in front of

patients in an unprofessional manner. Pl's Dep., Ex. B. at 93, 96, 106. O'Neal also stated that Myzwinski, who walked past her office four to five times a day, would always close her door when he passed by. Id. at 117-18, 122.

Myzwinski's interactions with O'Neal, although rude, are insufficient to create a hostile work environment. Myzwinski's constant closing of plaintiff's door, while similarly rude and unprofessional, also fails to rise to the level of an objectively hostile work environment.[5] Even when the ongoing harassing conduct is considered in light of all of the specific incidents outlined by O'Neal, she is still unable to show an objectively hostile work environment.[6]

**(ii) Discriminatory Intent**

Even if plaintiff could establish an objectively hostile

---

[5] Two courts have distinguished Torres where the plaintiffs' general allegations were not confirmed by co-workers. Ramos v. Marriott Intern., Inc., 134 F. Supp. 2d 328, 349 (S.D.N.Y. 2001); Gobin v. New York City Health and Hospitals Corp., No. 04-CV-3207, 2006 WL 2038621, at *5 (S.D.N.Y. July 19, 2006). Although it is unclear that Torres, which explicitly noted that the plaintiff's general allegations "were confirmed by her coworkers," 116 F.3d at 631, actually requires corroboration of general allegations, it should be noted that O'Neal fails to adduce any corroborating evidence of her allegations of continuing harassment.

[6] Although plaintiff relies on the mistreatment of other women in attempting to show that Myzinwski's actions were motivated by discriminatory intent, plaintiff does not rely on the mistreatment of other women in attempting to prove that an objectively hostile work environment existed. However, even if those facts are considered, plaintiff is still unable to show an objectively hostile work environment.

work environment, there is no evidence suggesting the gender-neutral harassment she endured was motivated by her gender. "[I]n order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." Alfano, 294 F.3d at 374 (quoting Brown, 257 F.3d at 252 (2d Cir. 2001)).

> Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.

Id. at 378 (collecting cases).

The conduct and incidents upon which O'Neal bases her hostile work environment claims are, as discussed below, on their face, gender neutral. Furthermore, the record contains no evidence that Myzwinski ever made disrespectful or demeaning comments regarding women, that he objected to the presence of women in the workplace or that he questioned the ability of women other than plaintiff to perform the job functions required of a drug counselor. Cf. Howley v. Town of Stratford, 217 F.3d 141, 155-56 (2d Cir. 2000) (holding that a supervisor's sexually derogatory comments supported the inference that later facially sex-neutral incidents were sex-based).

In the absence of such evidence, plaintiff argues that a

18

discriminatory intent on the part of Myzwinski can be inferred based on his claimed "differing treatment" of male and female employees.[7] However, there is insufficient evidence to establish an inference of discriminatory intent. Plaintiff relies on: (1) conclusory statements; (2) evidence that fails to show any actual differing treatment; and (3) evidence that is insufficiently fact-specific to show that female employees were treated differently from similarly situated male employees.[8]

Plaintiff relies on the following conclusory statements to establish that Myzwinski acted with discriminatory intent. During Hyacinth Charles's deposition, she was asked why she believed Bernadette Dawson, a female employee, did not get along with Myzwinski, Charles responded, "I think she may have felt like maybe he was racist or something like that."[9] Ex. 16 at 68.

---

[7] The term "differing treatment" is used herein to describe O'Neal's arguments because the phrase "disparate treatment" is ordinarily associated with discrimination cases involving adverse employment actions. See, e.g., Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) ("A showing of disparate treatment – that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' – is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case.") (citing Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000))). The two concepts are, ultimately, indistinguishable.

[8] Under Alfano, there must be "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." 294 F.3d at 378.

[9] That speculative statement may not even be admissible at trial.

19

Plaintiff also relies on a similarly conclusory statement from Dawson's declaration.[10]  Such conclusory assertions are insufficient to defeat defendants' motion for summary judgment. "[P]urely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to survive a summary judgment motion.  <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985); <u>Burroughs v. Chase Manhattan Bank, N.A.</u>, No. 01-CV-1929, 2005 WL 497790, at *5 (S.D.N.Y. Mar. 2, 2005) (citing <u>Mieri</u> and granting summary judgment motion on hostile environment claim where plaintiff simply asserted, without support, that her age was the reason why her supervisor did not like her).

Plaintiff also relies on Myzwinski's deposition to show differing treatment.  Although Myzwinski admitted to having confrontations with a number of female employees, Myzwinski also recalled having confrontations with male employees.  Myzwinski Dep., Ex. 1 at 25, 32-34.  "[I]n the absence of evidence suggesting that plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, [gives] rise to the inference that their mistreatment shared a common cause that was unrelated to their sex." <u>Brown</u>, 257 F.3d

---

[10]  In her declaration, Dawson states that she "found [Myzwinski] to be an unpleasant person – his behavior towards black female employees was frequently unprofessional, overbearing, and rude – and he treated other employees differently."  Dawson Decl. ¶ 9.  Dawson's declaration fails to point to any specific incidents to support her allegations of differing treatment.

at 254. In addition, plaintiff argues that Myzwinski was more hostile in his interactions with female employees and that "[a]ll of his tensions were directed at the female employees." Pl's Br. in Opp. to Summ. J. at 14. Myzwinski admitted to having two confrontations with female employees, Serap Turker and Jeanette Haines, that resulted in the female employees yelling at him. Myzwinski Dep., Ex. 1 at 26, 31-32. Plaintiff, however, fails to explain how the reaction of the female employees, standing alone, is evidence that Myzwinski treated them differently from their male counterparts. Plaintiff relies solely on Myzwinski's account of these confrontations in his deposition and does not include affidavits from either Turker or Haines describing the confrontations in question.

It must be noted that O'Neal admits Myzwinski did not shut the doors of any other employees. Pl's Complaint, Ex. A ¶ 22 (stating "Myzwinksi closing my office door felt like a personal attack because he would close <u>ONLY</u> my door") (emphasis in original); Pl's Dep., Ex. B at 191 (admitting that Myzwinski never tried to close the door of anyone else who worked at the clinic). That fact suggests that Myzwinski likely held a personal antipathy toward O'Neal, rather than any animus based on her gender. Furthermore, although O'Neal alleges that Myzwinski focused his ire at staff meetings solely on the female counselors by directly attacking their character and professional credentials, Pl.'s Decl. ¶¶ 31-33, O'Neal stated in her

deposition that Myzwinski frequently expressed annoyance "in general" at staff meetings. Pl's Dep., Ex. B at 161-72.

Plaintiff's remaining allegations of differing treatment rely on a number of statements made in O'Neal's declaration submitted in opposition to defendants' motion for summary judgment. First, O'Neal states that Myzwinski more closely scrutinized the charts of female counselors. Pl's Decl. ¶ 19. According to O'Neal, Myzwinski "would follow staff members into the records room and pick their chart up right after they filed it, even if they were not one of the counselor's [sic] he was directly supervising." Id. Second, O'Neal states that Myzwinski "scrutinized and harassed" women who had to leave the office for any reason such as a doctor's appointment," but "was not as concerned with where the male counselors may be going." Id. ¶ 20, 55. Third, O'Neal states that Myzwinski "harassed women in the office by giving them odd and demeaning looks when they went to the ladies bathroom which was across from his office." Id. ¶ 52-53. Fourth, O'Neal states that Myzwinski started locking the lunchroom door where the female staffers tended to congregate. Id. ¶ 8.

Defendants argue that the above allegations, which were not discussed in O'Neal's complaint or deposition, should be barred from consideration because "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the

plaintiff's affidavit opposing summary judgment and that

affidavit contradicts her own prior deposition testimony."

Brown, 257 F.3d at 252. O'Neal did not mention any of these

incidents in her deposition or address them in her complaint.

Furthermore, defense counsel asked O'Neal a number of deposition

questions that gave O'Neal an opportunity to raise any incidents

related to her claims that were not explicitly referred to in her

complaint. Defense counsel asked O'Neal:

> Can you tell me anything more now that we've
> covered what we have up to this point? Can you
> tell me about any other events related to the
> allegations in your complaint that would related
> [sic] to the allegations that are in your complaint
> that would support the claims you made in your
> complaint?"

Pl's Dep., Ex. E at 798-99. O'Neal responded "[n]o" to that

question. The following exchange also occurred at O'Neal's

deposition.

> Q: Now, let me ask a couple of more questions,
>     we're almost done. Okay, I believe we've
>     covered everything that's in the complaint
>     pretty thoroughly; is that correct?
>
> A: Correct.
>
> Q: Anything else you want to tell me about?
>
> A: No.

Pl's Dep., Ex. E at 855-56.

Although defense counsel conceivably could have asked more

pointed questions about whether any incidents occurred that were

not referenced in plaintiff's complaint, the questions asked by defense counsel gave O'Neal an adequate opportunity to raise any such incidents. Even if the allegations in O'Neal's declaration are considered, they are insufficient to give rise to a inference of discriminatory intent.

O'Neal attempts to raise an inference of discriminatory intent by showing that female employees were subjected to differing treatment in the same situations as male employees, such as in leaving the office for doctor's appointments. Such a claim is analogous to instances in which a discrimination plaintiff attempts to prove discriminatory intent by showing that "similarly situated" individuals were treated differently than the plaintiff. See Hargett v. National Westminster Bank, USA, 78 F.3d 836, 839 (2d Cir. 1996) (stating that "[a] plaintiff in a discrimination action may establish that the reason articulated by a defendant for termination of plaintiff's employment is a pretext and that race, in fact, did play a part in the decision to terminate by proving that 'similarly situated' white employees were treated more favorably than he"). "Where discriminatory motive is to be proved by evidence of disparate treatment, the plaintiff must demonstrate that employees who are similarly situated in all material respects received more favorable treatment." Alfano, 294 F.3d at 375 (emphasis added); see also Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir.

1989) (stating that to prove disparate treatment, a plaintiff must "identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently.") (quoting <u>Smith v. Monsanto Chemical Co.</u>, 770 F.2d 719, 723 (8th Cir. 1985)), <u>overruled on other grounds</u>, <u>Educadores Puertorriquenos en Accion v. Hernandez</u>, 367 F.3d 61, 64 (1st Cir. 2004).

O'Neal sets out two proffers of differing treatment, alleging that Myzwinski gave closer attention to both the female employees' charts and their requests to leave the office for doctor's appointments and similar appointments or errands. O'Neal's declaration, however, fails to identify any specific instances of differing treatment. Without knowing the specific circumstances in which female and male employees requested to leave the office for doctor's appointments, it cannot be shown that the female and male employees were in fact "similarly situated." <u>See</u> <u>Frankel v. U.S. Postal Service</u>, 96 F. Supp. 2d 19, 26 (D. Mass. 2000) (granting summary judgment on a sex discrimination claim and finding that there was insufficient evidence of disparate treatment, where, <u>inter</u> <u>alia</u>, the plaintiff had her request for leave to attend a funeral of a non-relative denied and a male employee's similar request was granted, but there was no evidence concerning "any of the other circumstances surrounding the respective requests.").

Moreover, plaintiff's reliance on minor instances of

differing treatment that did not result in any adverse employment actions makes it difficult for her to show discriminatory intent. Ordinarily, plaintiffs attempting to show disparate treatment focus on other employees that have similar qualifications, display similar disciplinary records or committed similar insubordinate acts.  See, e.g., Graham v. Long Island R.R., 230 F.3d 34, 42-43 (2d Cir. 2000) (reversing summary judgment where defendant fired black employee for violating a "last chance" disciplinary agreement, but white employee who violated a similar agreement was not fired).  The objective nature of such criteria makes those claims amenable to relatively straightforward proofs. In contrast, plaintiff's argument that Myzwinski subjected female employees to greater scrutiny (but without ever taking adverse actions against them) requires a detailed showing of the circumstances of Myzwinski's individual interactions with both the female and male employees.  O'Neal fails to proffer such evidence.

The final two acts of harassment that O'Neal cites to in her declaration are also insufficient to establish discriminatory intent.  Leering or staring can, based on the circumstances, be considered sexual harassment.  See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 75-76 (2d Cir. 2001) (reversing grant of summary judgment where in addition to making "obscene leers" at the plaintiff, the harasser touched the plaintiff in an unwelcome manner on a "daily basis," "tried to peer down her blouse and up

her skirt," and made "approximately ten or twenty" remarks about her sex life).  However, given the absence of any explicitly sexual nature to Myzwinski's "odd" and "demeaning" looks or any other evidence suggesting gender bias, a reasonable juror could not find, under the circumstances, that Myzwinski's "looks" give rise to an inference of discriminatory intent.  Finally, the fact that women congregated in the lunchroom that Myzwinski locked is also insufficient, given the circumstances, to suggest discriminatory intent.

**d.    Gender Discrimination Claim**

To prevail on a gender discrimination claim, a plaintiff "must first establish a prima facie case by demonstrating that: (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 151 (2d Cir. 2006) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).  Plaintiff's gender discrimination case was previously dismissed because her "complaint fail[ed] to allege the occurrence of any tangible employment action." <u>O'Neal</u>, 2003 WL 1524664 at *6.  O'Neal, however, was granted leave to file an amended complaint in order to pursue a claim of gender discrimination, where the adverse employment action was premised on a theory of constructive discharge.  Although O'Neal

added a claim of constructive discharge to her amended complaint, she proffers insufficient evidence for a reasonable juror to conclude that she was, in fact, constructively discharged.  As such, her claim of gender discrimination fails.

To maintain a constructive discharge claim, a plaintiff must show that her employer, instead of directly discharging her, deliberately made her working conditions so intolerable that she was forced into involuntary resignation.  Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004) (citing Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003)).  "Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions."  Id. at 229.  Courts measure constructive discharge against an objective standard:  the employer must have deliberately created working conditions "so difficult and unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  Terry, 336 F.3d at 152 (quoting Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996)).  Furthermore, a plaintiff must establish that the constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of [his] membership in [a protected] class."  Terry, 336 F.3d at 152 (citing Chertkova, 92 F.3d at 91).

As the Supreme Court recently explained in Pennsylvania State Police v. Suders, constructive discharge is a "worse case"

harassment scenario, a hostile working environment "ratcheted up to the breaking point." 542 U.S. 129, 147 (2004). "Without an actionable hostile environment claim, [a] plaintiff's constructive discharge claim must also fail." Ferraro v. Kellwood Co., No. 03-CV-8492, 2004 WL 2646619, at *11 (S.D.N.Y. Nov. 18, 2004) (citing Suders and explaining that "[c]onstructive discharge is regarded as an aggravated case of hostile work environment"), aff'd, 440 F.3d 96 (2d Cir. 2006). Thus, because O'Neal is unable to show a hostile work environment, her constructive discharge claim must also fail.

Even if plaintiff could show that she endured a hostile work environment, she points to no evidence that SUNY HSCB "deliberately and discriminatorily created work conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Ferraro, 440 F.3d 96, 101 (2d Cir. 2006) (internal marks and citation omitted).

**e.   Retaliation Claim**

To establish a prima facie case of retaliation, plaintiff must show: (1) she engaged in protected activity; (2) defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (citing McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001); see also

_Burlington Northern & Santa Fe Ry. Co. v White_, ___ U.S. ___ , 126 S.Ct. 2405, 2415 (2006). Recently, the Supreme Court clarified that a plaintiff must only show a "materially adverse" action to establish prima facie case of retaliation. _Burlington Northern_, 126 S.Ct. at 2415 (resolving circuit split on the issue and explaining that an action is "materially adverse" if it would "dissuade[] a reasonable worker from making or supporting a charge of discrimination.").

Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse action. _Jute_, 420 F.3d at 173. Once defendant meets its burden, plaintiff must "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." _Cifra v. G.E. Co._, 252 F.3d 205, 216 (2d Cir. 2001).

**(i) Prima Facie Case**

The complaint O'Neal filed on August 15, 2000 with NYSDHR clearly constitutes protected activity. Defendants concede that they had knowledge of O'Neal's protected activity.

Plaintiff asserts that a number of actions committed by defendant qualify as "materially adverse" under _Burlington Northern_. "Actions deemed materially adverse are those which cause the plaintiff actual hardship in one form or another." _Malone v. City of N.Y._, No. 05-CV-2882, 2006 WL 2524197, at *8

30

(E.D.N.Y. Aug. 30, 2006) (citing authority from circuits applying the "materially adverse" standard).  Plaintiff first points to defendants' letters dated September 13, 2000 and October 6, 2000. The initial letter rescinded O'Neal's unpaid leave of absence and ordered her to return to work on September 18, 2000.  The follow-up letter informed O'Neal that she was being placed on unauthorized leave without pay and that "continued unauthorized absence will subject you to disciplinary action."  It is unclear if those actions were "materially adverse."  O'Neal was ordered to return to work from authorized leave, but her benefits were not altered, suspended, or even threatened.[11]  Cf. Clark v. Potter, No. 1:05-CV-201, 2006 WL 2520348, at *3 (N.D. Ga. 2006) (finding seven-day delay in granting FMLA leave to be materially adverse because, although the plaintiff's pay was not suspended, during the seven-day window it was uncertain whether the plaintiff would suffer a financial loss for those days).  O'Neal

---

[11]  Although O'Neal alleges that she lost her health care coverage when her status was changed, defendant has offered un-rebutted evidence that once O'Neal exhausted her sick and vacation benefits on July 10 and was placed on leave without pay, Ex. P.; Brennan Decl. ¶ 6, she was required to pay for her own health insurance premiums, see Diamond Decl. in Further Supp. of Def's Mot. for Summ. J., Ex. E (letter from New York State Department of Civil Service stating that because O'Neal failed to make a required premium payment, her coverage was cancelled effective August 2, 2000).  The initial designation of O'Neal as being on "leave without pay," and not her subsequent designation as being on "unauthorized leave without pay," resulted in her having to pay her own health premiums.  See Ex. 20 (letter from Brennan to O'Neal stating that she was responsible for paying premiums to continue her health insurance benefits under COBRA once she went on leave without pay).

has not offered any evidence suggesting that being placed on unauthorized unpaid leave caused her any greater hardship than being on authorized unpaid leave. Although the two letters threatened O'Neal with discipline at some point in the future, that may be insufficient to constitute a "materially adverse" action.

In contrast, the October 10, 2000 letter from Brennan to O'Neal informed her that she had to submit to a disciplinary interview and that she was the subject of a disciplinary investigation. Ex. Y. One court has found that "[t]he initiation of a formal disciplinary investigation – even one that does not result in formal discipline" satisfies the "materially adverse" standard. <u>Doucet v. University of Cincinnati</u>, No 1:05-CV-148, 2006 WL 2044955, at *22 n.19 (S.D. Ohio July 19, 2006). Based on the October 10, 2000 letter, the prospect of O'Neal being disciplined was then imminent. Furthermore, the fact that the letter invited O'Neal to bring "a union representative or an attorney" underscored the serious and formal nature of the disciplinary interview. As such, the letter is sufficient to constitute a "materially adverse" action.

Finally, plaintiff is able to show, for purposes of her prima facie case, a "causal connection" between the October 10th letter and her discrimination complaint based solely on the temporal proximity (around a month-and-a-half) of the letter and defendant's receipt of O'Neal's complaint. <u>See</u> <u>Feingold v. New</u>

York, 366 F.3d 138, 156 (2d. Cir. 2004) (finding temporal proximity of two weeks sufficient to show causal connection for purposes of proving prima facie case). As such, plaintiff has established a prima facie case of retaliation.

**(iii) Defendants' Legitimate, Non-Retaliatory Reasons**

Defendants point to Dr. Smith's August 30, 2000 report as the reason why O'Neal was ordered to return work. Furthermore, defendants also assert numerous reasons for challenging O'Neal's workers' compensation claim. As outlined in Brennan's November 6, 2000 letter: (1) Dr. Smith concluded that O'Neal was able to perform her job; (2) according to Myzwinski, O'Neal's door did not strike her knee; (3) O'Neal made no claim of injury to her supervisors until the week after the incident; (4) O'Neal did not submit a workers' compensation claim until almost a month after her alleged injury; (5) according to Halloran, prior to June 8th incident, O'Neal told him that she suffered from a disability in both her knees and would soon be taking a leave of absence for that reason; (6) despite her admission to Halloran, O'Neal told Dr. Smith that she suffered from no disabilities in her knee before the workplace injury; (7) on June 21, 2000, Dr. Khan cleared O'Neal to return to work on July 12, 2000; and (8) O'Neal changed doctors and then received a different diagnosis supporting her claim of disability.

**(iv) Pretext**

In her brief, plaintiff never formally sets out what actions

33

by defendants she believes establish pretext. Plaintiff's argument appears to be that because SUNY HSCB had medical documentation from Dr. Bernstein stating that she was disabled, there was no justification for defendants to demand that she return to work or for defendants' vigorous challenge of her workers' compensation claim. Plaintiff fails to appreciate that the conflicting facts before Brennan justified SUNY HSCB's actions. When faced with different diagnoses from plaintiff's own physician and an independent medical examiner, defendants were certainly justified in ordering plaintiff back to work. In Tenkku v. Normandy Bank, 348 F.3d 737, 742 (8th Cir. 2003), the Eight Circuit upheld a grant of summary judgment on a retaliation claim where the employer received criticisms of the plaintiff's performance from "independent third parties" after the plaintiff had filed her discrimination complaint. Id. The court concluded that "[t]hese 'intervening unprotected [events] eroded any causal connection that was suggested by the temporal proximity'" the plaintiff's protected conduct and the adverse employment actions, which occurred six months apart. Id. (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)).

Even if O'Neal is correct that Dr. Smith only gave her a cursory five-minute examination, absent some evidence suggesting either defendants' complicity in (or, at the very least, knowledge of) the allegedly shoddy examination, that fact does not show that defendants acted with retaliatory intent by relying

34

on Dr. Smith's independent medical examination.[12] Defendants'
actions were further justified by the fact that Dr. Khan had
previously concluded that O'Neal would be able to return to
work.[13] Additionally, the various other facts cited in Brennan's
letter, particularly Myzwinski's account of the June 8, 2000
incident, justified ordering a disciplinary interview and
contesting O'Neal's workers' compensation claim.

Plaintiff also asserts that SUNY HSCB failed to follow its
own procedures in sending the September 13, 2000 letter that
informed her that SUNY HSBC had rescinded her leave of absence.
Although a "violation of an organization's internal procedures
alone is insufficient to create an inference of discrimination.
Failure to follow internal procedures can, however, 'be evidence
of pretext.'" Petrovits v. New York City Transit Authority, No.
95-CV-9872, 2002 WL 338369, at *8 (S.D.N.Y. Mar. 4, 2002)
(denying summary judgment on the plaintiff's gender
discrimination claim where employer failed to sign internal EEO

---

[12] O'Neal asserts that both Dr. Bernstein, Ex. 24, and Dr.
Haher, Pl's Decl. ¶ 127, told her that Brennan attempted to
improperly influence their diagnoses. O'Neal fails to produce
any affidavits or deposition testimony from her doctors
supporting those assertions. Rather, O'Neal relies solely on her
own account of what the doctors told her. The majority of
O'Neal's testimony on this issue is likely inadmissible hearsay.

[13] O'Neal asserts that Khan issued these somewhat confusing
letters because he was not an orthopedic specialist and was not
qualified to state that O'Neal was permanently disabled or had a
long-term permanent disability. Pl's Decl. ¶ 16. There is no
evidence, however, that O'Neal ever informed defendants of that
explanation.

form and the plaintiff was at least as qualified as the employee who received disputed promotion) (citations omitted); see also Sklaver v. Casso-Solar Corp., No. 02-CV-9928, 2004 WL 1381264, at *9 (S.D.N.Y. May 15, 2004) (denying summary judgment on age discrimination claim where defendant failed to follow its own policy of progressive discipline). To support her claim, plaintiff points to a handwritten note, apparently from Stephanie Watson, in which Watson discusses the September 13th letter. The note states, in relevant part:

> On 9/12/00 Ms Jennings brought over a return to duty letter along with a medical evaluation from a [Fund] doctor. Ms Jennings informed me of the changes to be made and that the letter has to go out immediately. Normal procedures would include a return to duty notice from a physician.

Ex. 19. The letter, which is ambiguous, suggests, when read in the light most favorable to plaintiff, that SUNY HSCB may have had a policy requiring a return to duty notice and that the policy may have been violated in this case. Plaintiff, however, failed to depose Watson or Jennings concerning the note and did not ask any witnesses, including Brennan, the Deputy Director of Labor Relations, deposition questions about SUNY HSCB's policy concerning return to duty notices.

The only other evidence plaintiff points to is the temporal proximity of defendants' adverse action to the filing of plaintiff's discrimination complaint. Temporal proximity between adverse actions and a plaintiff's complaint of discrimination can

be sufficient to show pretext. <u>See</u> <u>Quinn v. Green Tree Credit</u>
<u>Corp.</u>, 159 F.3d 759, 770 (2d Cir. 1998) (finding that the
evidence suggested a "strong correlation between" plaintiff's
complaints and her termination where complaints and termination
occurred less than two months apart and nearly all of the
evidence supporting defendant's asserted non-discriminatory
reasons for the discharge were generated by two of the alleged
harassers), <u>abrogated in part on other grounds by</u> <u>Nat'l R.R.</u>
<u>Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002). Generally,
district courts in the Second Circuit have found that "a passage
of two months between the protected activity and the adverse
employment action seems to be the dividing line." <u>Cunningham v.</u>
<u>Consolidated Edison Inc.</u>, 03-CV-3522, 2006 WL 842914, at *19
(E.D.N.Y. Mar. 28, 2006) (collecting cases). In contrast, courts
have, in certain circumstances, found close temporal proximity
alone to be insufficient to establish pretext. <u>See</u> <u>Slattery v.</u>
<u>Swiss Reinsurance America Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001)
(affirming denial of summary judgment on retaliation claim and
holding that "[w]here timing is the only basis for a claim of
retaliation, and gradual adverse job actions began well before
the plaintiff had ever engaged in any protected activity, an
inference of retaliation does not arise."); <u>Absher v.</u>
<u>FlexiInternational Software</u>, Inc., No. 302-CV-171, 2005 WL
2416203, at *8 (D. Conn. 2005) (granting summary judgment on
retaliation claim where slightly less than one month elapsed

between complaint and termination, but there was "ample evidence" showing plaintiff's "work-performance shortcomings" and defendant laid off other employees in plaintiff's department both before and after plaintiff's termination).

As previously noted, the "materially adverse" action taken by defendants (the October 10, 2000 letter) occurred around a month-and-a-half after employees at SUNY HSCB received a copy of O'Neal's discrimination complaint. Although such temporal proximity could, in some circumstances, give rise to an inference of retaliatory intent, Dr. Smith's evaluation "eroded any causal connection" suggested by temporal proximity in this case.[14] Tenkku, 348 F.3d at 742. The mere filing of a discrimination complaint cannot paralyze an employer from making personnel decisions.

---

[14] Although not cited by the parties, Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004), might appear to compel a different result. Feingold, however, is distinguishable from the instant case. In Feingold, the court rejected the argument that an intervening event precluded drawing an inference of discrimination where the temporal proximity between the complaint and the adverse action was two weeks. Although the court in Feingold relied on temporal proximity in concluding that there was sufficient evidence of causal connection to establish a prima facie case, the court did not rely on temporal proximity in analyzing whether the plaintiff came forward with sufficient evidence to establish an inference to show pretext. It is important to note that "[a] plaintiff's burden at [the] prima facie stage is de minimis." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). The instant case turns on the fact that O'Neal is ultimately unable to establish an inference of discriminatory intent and not on whether O'Neal can establish a prima facie case. Furthermore, the intervening event in Feingold did not involve an "independent third party."

38

Furthermore, Myzwinski's June 27, 2000 memorandum setting forth his version of the June 8, 2000 incident supports that conclusion. Ex. L. The account given in this memorandum is virtually identical to the version that Myzwinski later recited to Brennan and upon which Brennan relied on in his November 6, 2002 letter. Myzwinski's memorandum was drafted over two weeks before O'Neal filed a discrimination complaint on August 15, 2000. As such, this memorandum likely dispels the notion that a retaliatory motive was behind Myzwinski's version of the June 8th incident. When employees have extensive documented disciplinary records prior to any complaint being filed, courts have found close temporal proximity insufficient to establish pretext. Slattery, 248 F.3d at 95. Admittedly, Myzwinski's single memorandum is not as probative as a extensive documented disciplinary record. However, once Myzwinski's memorandum is considered with Dr. Smith's evaluation and the other evidence supporting defendants' actions, it cannot be said that there is sufficient evidence to give rise to an inference of retaliatory intent.[15] That conclusion holds true even when the temporal

---

[15] In contrast to Quinn, 159 F.3d 770, the majority of evidence supporting defendants' non-discriminatory reasons was not generated by Myzwinski, the alleged harasser. Brennan also relied on: (1) Dr. Smith's independent evaluation; (2) the apparent discrepancy between the diagnoses of Dr. Kahn and Dr. Bernstein; and (3) the statements of Halloran, who was not accused of harassment.

proximity of defendant's adverse action[16] is considered in light
of the other evidence relied on by plaintiff to show retaliatory
intent.

**f.     State Law Tort Claim**

Plaintiff's state law claim against SUNY HSCB was previously
dismissed in the March 24, 2003 Memorandum and Order.  O'Neal,
2003 WL 1524664, at *8.  As such, that claim should not have been
included in plaintiff's amended complaint.  In the amended
complaint, plaintiff also asserts the same state law claim
against Brennan, who is named in his official capacity.  Filing a
claim against a state officer acting in his official capacity is
equivalent, for purposes of the Eleventh Amendment, to filing a
claim against the state itself.  Pennhurst State Sch. & Hosp. v.
Halderman, 465 U.S. 89, 106 (1984); Ying Jing Gan v. City of New
York, 996 F.2d 522, 529 (2d Cir. 1993) (stating that "[t]o the
extent that a state official is sued for damages in his official
capacity, such a suit is deemed to be a suit against the state,
and the official is entitled to invoke the Eleventh Amendment
immunity belonging to the state.")  Accordingly, the state law
claim against Brennan is also dismissed.

---

[16] Even if defendant's September 13th and October 6th
letters were considered "materially adverse" actions (thus
compressing the period between complaint and adverse action to
less than one month), plaintiff's evidence is still insufficient
to give rise to an inference of retaliatory intent.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to enter judgment and to close the case.

Dated:  Brooklyn, New York
        November 7, 2006

                    SO ORDERED:


                    _____/s/_____
                    David G. Trager
                    United States District Judge